## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **Gabriella Herroeder-Perras, on behalf of herself and all others similarly situated,** | Civil Action No. _____ |
| **Plaintiff,** | **CLASS ACTION COMPLAINT** |
| **v.** | **JURY TRIAL DEMANDED** |
| **INTEL CORPORATION,** | |
| **Defendant.** | |

Plaintiff Gabriella Herroeder-Perras, by and through counsel, on behalf of herself and all others similarly situated, brings this action against Defendant Intel Corporation ("Intel") for damages, and demands trial by jury, complaining and alleging upon information and belief as follows:

### NATURE OF THE ACTION

1.      This action concerns Intel's anticompetitive and monopolistic practices in the conduct of trade or commerce, specifically those acts and practices that it intended to use, did use, and continues to use to prevent and destroy competition and acquire and/or maintain monopoly power and raise prices to supra-competitive levels in the market for microprocessors that run the Microsoft Windows and Linux families of operating systems ("the x86 Microprocessor Market").

2.      Intel dominates the x86 Microprocessor Market, with greater than an 80 percent market share as measured by unit volume and greater than a 90 percent market share as measured by revenue.  It has engaged in a series of anticompetitive acts that

were designed to, and did, eliminate competition and prevent entry in the x86 Microprocessor Market.

3.      Intel has used its monopoly power to injure consumers, by charging supra-competitive prices for its microprocessors, which supra-competitive prices were passed on to consumers, and by reducing the pace and quality of innovation.

4.      Plaintiff, on his own behalf and on behalf of the class defined below, seeks to recover for the injuries to his business or property resulting from his overpayments for Intel microprocessors.  Plaintiff also seeks injunctive and declaratory relief and costs, including reasonable attorneys' fees.

## JURISDICTION AND VENUE

5.      The Court has jurisdiction pursuant to 28 U.S.C. § 1332(d), in that this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some members of the proposed class are citizens of a state different from the defendant.

6.      Venue is proper pursuant to 28 U.S.C. § 1391(a) because Intel resides and is subject to personal jurisdiction in this District and because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## PARTIES

7.      Plaintiff Gabriella Herroeder-Perras is a resident of San Diego County, California.  During the relevant time period, Plaintiff purchased a Dell computer that contained an Intel microprocessor.

8.      Defendant Intel Corporation is a Delaware corporation with its principal place of business in Santa Clara, California.  It conducts business both directly and

through wholly-owned and dominated subsidiaries worldwide. Intel and its subsidiaries design, produce, and sell a wide variety of microprocessors, flash memory devices, and silicon-based products for use in the computer and communications industries.

## CLASS ALLEGATIONS

9.    Plaintiff brings this action under Federal Rule of Civil Procedure 23(b)(3) on his own behalf and on behalf of the following Class:

> All individuals and entities located in the United States that purchased a microprocessor indirectly from the defendant, or any controlled subsidiary or affiliate thereof, in one of the Included States (defined below), at any time during the period from July 12, 2001 to the present (the "Class Period"), other than for resale. The Class excludes the defendant and its agents, subsidiaries, affiliates, officers, directors, and employees. The Class further excludes government entities, the judge presiding over this case, and the judge's immediate family and staff.

10.    For purposes of the Complaint and class definition, the "Included States" are Alaska, Arizona, Arkansas, California, the District of Columbia, Florida, Idaho, Iowa, Kansas, Maine, Michigan, Montana, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

11.    Plaintiff does not know the exact number of class members because such information is in the exclusive control of Intel and third parties. However, due to the nature of the trade and commerce involved, Plaintiff believes that the members of the Class are sufficiently numerous and geographically diverse that joinder of all members of the Class is impracticable. Fed. R. Civ. P. 23(a)(1).

12.    There are questions of law and fact common to the Class, including but not limited to the following:

a.    Whether Intel engaged in anticompetitive conduct that renders it liable to the Class under state antitrust and consumer protection laws;

b.    Whether Intel possessed monopoly power in the relevant market;

c.    Whether Intel acquired or maintained monopoly power within the relevant market through anticompetitive activity; and

d.    Whether Intel's unlawful conduct has caused legally cognizable injury to Plaintiff and the Class by enabling Intel to increase, maintain, or stabilize above competitive levels the prices that Plaintiff and Class members have paid for x86 microprocessors, and if so, the appropriate class-wide measure of damages.

13.    These common questions and others predominate over questions, if any, that affect only individual members of the Class. Fed. R. Civ. P. 23(a)(2) and 23(b)(3).

14.    Plaintiff's claims are typical of, and not antagonistic to, the claims of the other Class members because Plaintiff, by advancing his claims, will also advance the claims of all members of the Class and because Intel participated in activity that caused members of the Class to suffer similar injury. Fed. R. Civ. P. 23(a)(3).

15.    Plaintiff and his counsel will fairly and adequately protect the interests of absent Class members. There are no material conflicts between Plaintiff's claims and those of absent Class members that would make class certification inappropriate. Counsel for Plaintiff are experienced in complex class action litigation, including litigation involving antitrust allegations, and will vigorously assert Plaintiff's claims and those of the members of the Class. Fed. R. Civ. P. 23(a)(4).

16.    A class action is superior to other methods for the fair and efficient resolution of this controversy. The class action device presents fewer management difficulties, and provides the benefit of a single adjudication, economy of scale, and comprehensive supervision by a single court. Fed. R. Civ. P. 23(b)(3).

17.     Whatever difficulties may exist in the management of the class action will be greatly outweighed by the benefits of the class action procedure, including but not limited to providing Class members with a method for the redress of claims that may not otherwise warrant individual litigation.

## INTEL'S MONOPOLY POWER IN THE RELEVANT MARKET

### The Relevant Product Market

18.     The relevant product market is the x86 Microprocessor Market.

19.     A microprocessor, also called a microchip or chip, is an integrated circuit that contains the entire central processing unit for a computer.  Original equipment manufacturers ("OEMs") use these microprocessors to power the computers that ultimately are purchased by consumers.

20.     Although other microprocessors, besides x86 microprocessors, are offered for sale, these other microprocessors are not reasonably interchangeable with x86 microprocessors because none can run the x86 Windows or Linux operating systems or the application software written for them.

21.     A putative monopolist in the x86 Microprocessor Market would be able to raise the prices of x86 microprocessors above a competitive level without losing so many customers to other microprocessors as to make this increase unprofitable.  While existing end-users can theoretically shift to other operating system platforms, high switching costs associated with replacing existing hardware and software make this impractical.  Further, the number of new, first-time users who could choose a different operating system platform is too small to prevent an x86 microprocessor monopolist from imposing a meaningful price increase for a non-transitory period of time.  Computer manufacturers

would also encounter high switching costs in moving from x86 microprocessors to other architectures, and no major computer maker has ever done it. In short, demand is not cross-elastic between x86 microprocessors and other microprocessors at the competitive level.

### The Relevant Geographic Market

22.     The relevant geographic market is worldwide. Indeed, in its July 1998 Answer to a complaint by the Federal Trade Commission, Intel admitted that the relevant geographic market was the world.

23.     Intel and its competitors in the x86 Microprocessor Market compete globally. Platform architecture is the same from country to country; microprocessors can be easily and inexpensively shipped around the world, and frequently are; and the potential for arbitrage prevents chipmakers from pricing processors differently in one country than another.

### Intel's Monopoly Power in the Relevant Market

24.     Intel dominates the worldwide x86 Microprocessor Market. According to published reports, over the last several years it has consistently achieved more than a 90 percent market share as measured by revenue. In seven of the last eight years, Intel has captured at least 80 percent of x86 microprocessor unit sales.

25.     Intel's only meaningful competitor in this market is Advanced Micro Devices, Inc. ("AMD"). AMD's revenue share has remained at approximately 9 percent, while its worldwide volume share has hovered around 15 percent, only once penetrating the 20 percent level.

26.     Another competitor, Cyrix, was acquired by National Semiconductor in 1997, and exited the market two years later.  As of the beginning of 2005, only two other x86 chipmakers remained – Via Technologies, Inc. and Transmeta Corporation. Transmeta has since announced its intention to cease selling x86 microprocessors, and Via has a less than 2 percent market share.

27.     Intel is shielded from new competition by huge barriers to entry.  A chip fabrication plant capable of efficiently mass-producing x86 microprocessors costs at least $2.5 billion.  In addition, billions of dollars in research and development costs would be required to design a competing x86 microprocessor and to overcome almost insurmountable intellectual property and knowledge barriers.

28.     Intel has reaped huge financial benefits from its monopoly position. Intel's revenue from microprocessor sales alone exceeded $24 billion in 2004.  In 2003 and 2004, operating margins for the Intel Architecture business, which develops and sells microprocessors, were approximately 40 percent.

## Distribution in the Relevant Market

29.     Annual worldwide consumption of x86 microprocessors currently stands at just over 200 million units per year and is expected to grow by 50 percent over the remainder of the decade.  Relatively few microprocessors are sold for server and workstation applications (8.75 million in 2004), but these command the highest prices. Most x86 microprocessors are used in desktop personal computers ("PCs") and mobile PCs, with desktops currently outnumbering mobiles by a margin of three to one.  Of the total worldwide production of computers powered by x86 microprocessors, 32 percent are sold to United States consumers.

30.     The majority of x86 microprocessors are sold to a handful of large OEMs, highly visible companies recognized throughout the world as the leading computer makers.  Nine OEMs – regarded in the industry as "Tier One" – together account for almost 80 percent of servers and workstations, over 40 percent of desktop PCs, and over 80 percent of mobile PCs.  These "Tier One" OEMs are Hewlett-Packard, which now also owns Compaq Computer; Dell; IBM, which sold its PC business to Lenovo as of May 1, 2005; Gateway/eMachines; and Fujitsu/Fujitsu Siemens.  Toshiba, Acer, NEC, and Sony are also commonly viewed as Tier One OEMs in the notebook segment of the PC market.  The Tier One OEMs operate on small or negative profit margins.

31.     The balance of x86 production is sold to smaller system builders and to independent distributors.  The latter, in turn, sell to smaller OEMs, regional computer assemblers, value-added resellers, and other, smaller distributors.

32.     OEMs sell computers through a variety of distribution channels, including through the internet, company-employed sales staffs, independent distributors, and retail chains.  Microprocessor manufacturers compete not only to have OEMs incorporate their products into their retail platforms but also to convince retailers to allocate shelf space so that the platforms containing their respective microprocessors can be purchased in the retailers' stores.

## INTEL'S UNLAWFUL, ANTICOMPETITIVE ACTIVITIES

### Intel's Acquisition of Monopoly Power

33.     In the early 1980s, IBM defined the original PC standards, choosing among a variety of microprocessors, including those developed by Motorola, Zilog, National Semiconductor, Fairchild, Intel, and AMD.  IBM opted for the Intel architecture, which utilized what became known as the x86 instruction set (after Intel's naming convention for its processors, *i.e.*, 8086, 80186, 80286, 80386, etc.).  IBM demanded, however, that Intel contract with another integrated circuit company and license it to manufacture 8086 chips as a second source.  AMD agreed to abandon its own, competing architecture, and undertook to manufacture 8086 chips as a second source of supply.

34.     In February 1982, Intel and AMD entered into a ten-year agreement by which either company could elect to be a second source for products offered to it by the other.  Under the contract, AMD could initially obtain second-source rights to Intel's 8086 chip and other specified products for cash; after 1985, AMD would have open access to Intel's product line if Intel accepted AMD products of sufficient value.  AMD served as a second source to the successors to the 8086 chip: the 80186 and 80286.

35.     Beginning in mid-1984, Intel, which was anxious to be the sole source for its upcoming 32-bit chip – the 80386 – decided to frustrate the operation of the contract by taking no more products from AMD.  Furthermore, Intel kept its decision secret from AMD and the public.  As internal Intel documents stated, Intel's objective was to "[a]ssure AMD they are our primary source through regular management conduct and formal meetings" in order to "[k]eep AMD in the Intel camp."  A 1986 Intel

memorandum articulated its strategy: "Maintain a second-source, business as usual posture in the marketplace. . . . Our strategy is to keep talking. . . . We do not want [AMD] to go on to Hitachi or NEC, and should not stimulate them to do so."

36.    Intel's plan succeeded: for about two years, AMD continued to believe, incorrectly, that it would be permitted to second-source the 80386 microprocessor.  As an arbitrator later found, in a ruling that was confirmed by the California Supreme Court, "Intel to some extent lulled AMD into some sense of well-being about the continuation of the relationship and to some extent contributed to AMD's delay in reverse engineering the 80386."

### Development of AMD as a Threat to Intel's Monopoly

37.    Intel's conduct in the 1980s gave it a significant head start over AMD in the x86 Microprocessor Market.  Not until June 1999 did AMD unveil its first x86 chip without Intel pin-compatibility, the Athlon microprocessor.  Significantly, Athlon was the first x86 microprocessor to run at a speed of 1 GHz, and outperformed Intel's Pentium III chip in benchmark tests.

38.    AMD's Athlon microprocessor consistently was recognized by the industry as a superior product.  In 2000, Athlon captured the "triple crown" of computing accolades, winning the PC World Product of the Year award, the PC Magazine Technical Excellence prize for Best Component in Hardware Category, and the Maximum PC magazine CPU of the Year Award.  By the end of 2001, Athlon had received more than 80 awards worldwide.

39.    In April 2003, AMD introduced the Opteron microprocessor, the world's first 64-bit x86 microprocessor for severs.  Several months later, AMD released the

Athlon 64 microprocessor, its 64-bit x86 microprocessor for desktops and notebooks. Importantly, and in contrast to Intel's Itanium microprocessor, AMD's new microprocessors were backward-compatible, meaning that they could accommodate 32-bit software as well as 64-bit programs.

40.    In November 2003, PC Magazine awarded the Athlon 64 and Opteron microprocessors its Award for Technical Excellence in the Components category. The magazine wrote: "We tested the first 64-bit AMD Opteron processor in April 2003, and were we impressed! It screamed on our server application performance tests. Six months later, the Athlon 64 arrived, and again we were amazed by the processor's stellar performance in off-the-shelf 32-bit gaming, content creation, and business applications." By the end of 2004, the Athlon 64 and Opteron microprocessors had won over 60 awards for innovation and performance.

41.    As Dell's CEO, Kevin Rollins, explained in February 2005, "[w]hen one of our partners slips on the economics or they slip in terms of the technology, that causes us great concern. For a while Intel admittedly slipped technologically and AMD had stepped forward, and we were seeing that in terms of customer response and requests."

42.    Notwithstanding AMD's technical achievements and generally lower prices, Intel continues to dominate the x86 Microprocessor Market. By means of Intel's anticompetitive conduct, AMD's market share has been constrained unlawfully. Among other things, this has prevented AMD from achieving minimum levels of efficient scale necessary to compete with Intel as a predominant supplier to major customers. As a result, consumers of x86 microprocessors are forced to pay supra-competitive prices, are

limited in their choice of products, and are denied the benefits of innovative

developments.

43.  *Infoworld* magazine analyzed the competitive landscape in its August 27,

2004 issue:

> AMD has become known as the company that kept Intel
> honest, the Linux of the semiconductor world.  Competition
> from AMD has reversed the trend of rising prices and
> stagnant innovation that characterize a controlled market.
> AMD is responsible for $500 desktops, $1,200 rack
> servers, and multigigahertz mainstream microprocessors,
> despite the fact that most of them have Intel's logo on them.
>
> Today, AMD's pluck is paying off bigger than ever before.
> After decades of aping Intel architectures, the AMD64
> architecture, rooted in Opteron and Athlon 64 processors,
> has actually been imitated by Intel in the form of Nocona,
> Intel's 64-bit version of Xeon.  In a stunning reversal of
> fortune, Intel was forced to build that chip because Opteron
> was invading a server market that the Intel Itanium was
> supposed to dominate.
>
> Suddenly, Intel is feeling a breeze where its pants used to
> be.  But with Intel mad as hell and hot on AMD's heels,
> can AMD grab enough sales traction to hold up to the
> punishing onslaught everyone knows is coming?

44.  Rather than engage AMD in lawful competition, Intel has responded to

AMD's threat to its monopoly position with a variety of anticompetitive practices

directed at OEMs, distributors, and retailers, and involving industry standard-setting and

other technical abuses.  These anticompetitive practices are discussed below.

## Intel's Anticompetitive Practices Directed at OEMs

45.    At least in the short term, most if not all of the major OEMs must engage significantly with Intel for several reasons.  First, AMD is too small to service all of an OEM's needs while continuing to satisfy other customer demand.  Second, to meet customer expectations, OEMs must assure commercial computer buyers that specifications, including the microprocessor, will remain unchanged during the product's lifecycle.  Third, Intel has encouraged end-users to specify that microprocessors be of the same family among similar computers in one installation, as this is perceived to increase reliability (although technically this is not the case).  Intel has exploited OEMs' need to engage significantly with Intel by directing a series of anticompetitive practices at OEMs designed to limit AMD's growth.

46.    Through direct payments and other financial inducements, Intel has forced OEMs into exclusive and near-exclusive deals, thereby limiting AMD's ability to gain incremental market share.  In addition, Intel has bought limited exclusivity from OEMs in order to exclude AMD from the most profitable lines or from channels of distribution best tailored to take advantage of AMD's price/performance advantage over Intel.  For example, Intel has largely foreclosed AMD from the lucrative commercial desktop sector.

47.    An April 5, 1999 article in *PC Week* described the coercive effect of one such form of payment, the "Intel Inside" program:

> The wildly successful program, which began broadly in 1994 as a way to create brand equity for the Pentium processor, has evolved into Intel's premier marketing vehicle, managed by an army of attorneys, accountants and administrators.  Intel has deftly used the program to keep competitors at bay in the most profitable segment of its business: corporate PCs.  That, in turn, has left computer buyers with fewer options – and higher prices – when

choosing business desktops, notebooks and PC servers. A look at the Intel Inside program requirements, which Intel keeps under tight wraps, shows how fully the chip maker controls the marketing purse strings of PC makers that sign on. Interviews with numerous current and former executives at Intel's largest OEM customers – all of whom declined to be identified, fearing reprisals from Intel – add fuel to the fire. These executives call the program addictive and claim their companies can't compete without it. . . .

The marketing dollars are enough of a carrot to make PC vendors sign off on Intel's restrictive program requirements. Before PC makers are eligible for reimbursement, they must sign an OEM Trademark License Agreement that regulates everything from logo size and color to branding. The eligible systems are added to a form called Attachment C, which Intel uses to keep track of qualifying Intel Inside products. OEMs must modify Attachment C every time they introduce a new Intel-based system. Once a PC maker meets all Attachment C guidelines, Intel reimburses 6 percent of the total average selling price of each vendor's worldwide monthly microprocessor shipments. But Intel doesn't give the cash back to the PC makers to use as they wish; instead, it deposits the money into an Intel-managed market development fund, or MDF, which the vendors must use to pay for print, Web, broadcast or radio advertising of their Intel-based systems. If they don't use the funding within 12 months, they lose it. . . .

If a vendor strays from Intel's guidelines – even for an infraction as minor as using the wrong size Intel logo on their packaging – Intel can freeze its eligible marketing funds. Since the funds come from the PC companies' chip payments, many customers believe Intel artificially inflates processor pricing to cover the costs. "They already have your extra money," said a veteran executive who retired last year from a top PC company. "They're charging you more money and then giving it back to you so you can advertise their products." . . .

In addition to its impact on pricing, the Intel Inside program also affects PC makers' product decisions. Although the guidelines don't prohibit use of non-Intel chips, they provide strong monetary disincentives to do so,

several OEMs said. How strong? A licensee forfeits all
MDF funding for a brand if it adds a non-Intel chip to the
line. If it wishes to use another vendor's processor, it must
establish an entirely new brand or sub-brand for that chip to
retain funding for the existing brand. "There is no doubt
that it's one of the major factors that influence [product]
decisions," said a 20-year IBM PC executive who left the
company in 1997. The source spoke from experience. In
1995, he said, IBM built several prototypes of low-cost
retail and small-office PCs based on Cyrix processors. But
executives scrapped the plans, in part because they couldn't
leave what the source described as a "substantial" amount
of advertising money on the table. The branding
restrictions go a long way toward explaining why none of
the top 10 PC makers uses non-Intel chips in its business
desktop lines.

48.    In addition, Intel has imposed on OEMs a system of first-dollar rebates

that have the practical and intended effect of creating exclusive or near-exclusive dealing

arrangements and artificially foreclosing AMD from competing for a meaningful share of

the market. In order to qualify for a rebate on any of its purchases, an OEM must first

achieve a target level of purchases set by Intel. Only upon an OEM's reaching this target

will Intel retroactively provide a rebate. Intel intentionally sets a rebate trigger at a level

of purchases it knows to constitute a dominant percentage of a customer's needs.

49.    Intel's rebate schemes are discriminatory and market-foreclosing. If a

customer chooses to purchase any significant quantity of microprocessors from an Intel

competitor such as AMD, it will not qualify for its rebate, and its price will be higher on

all the Intel processors it buys across the board. By tailoring targets to each customer's

size and anticipated volume, Intel locks up significant percentages of the market much

more effectively and at a lesser cost to itself – but to a greater harm to AMD and

ultimately consumers – as compared to offering such rebates for comparable purchase

levels to all customers on a nondiscriminatory basis.

50.     The use of retroactive rebates to limit AMD to a small share of an OEM's business heightens the obstacle to inducing the OEM to launch AMD-powered platforms. OEMs incur substantial expense in designing and engineering a new computer, and make the investment only if they foresee a substantial chance of selling a sufficient volume to recoup it. Intel's rebate and other business strategies effectively cap the volumes of AMD-powered products that an OEM can sell. Hence, Intel's practices exacerbate normal impediments to entry and expansion.

51.     Intel also uses product bundling in an exclusionary manner. For example, in bidding for a new OEM platform, Intel bundles microprocessors with free or heavily discounted chipsets or motherboards. Because AMD does not sell chipsets or motherboards, this product bundling enables Intel to avoid competing with AMD directly on microprocessor price and quality by imposing disproportionate burdens on AMD that are wholly unrelated to AMD's product quality.

52.     The above anticompetitive practices are compounded by the potential for retaliatory threats. Intel has a variety of pressure points at its disposal: it can unilaterally reduce or withdraw a discount, rebate, or subsidy; it can impose a discriminatory price increase on a disfavored customer, extend a price cut to that customer's competitor, or force retailers into dropping the customer's computers and buying from its competitor instead; or it can delay or dispute an allowance or rebate – all of which can turn a profitable quarter for an OEM into an unprofitable one.

53.     Intel has the capability to use such threats not only to deter OEMs from purchasing microprocessors from AMD, but also to undermine AMD product launches. For example, the April 25, 2003 issue of *The Inquirer*, a computer industry journal,

reported that Intel used implicit threats to keep vendors from attending AMD's launch of its Opteron chip:

> [The vendors] all told me that prior to the launch, they received a phone call from Intel. Intel asked if they were going to the launch. If they replied yes, the Intel rep asked them if it was 'important to them to go', or 'if they really wanted to go'.
>
> Pressing the vendors, I got the same response, 'Intel is too smart to threaten us directly, but it was quite clear from that phone call that we would be risking our various kickback money if we went'. If one vendor had said this to me, or even two, I would have put it down as little more than an annoyed vendor, but they all told me this. When asked for clarification, the stories sounded more and more alike, a pleasant sounding phone call from the Intel rep that made the hair on the back of their necks stand on end, and left no doubt in their minds as to what the 'request' actually was.
>
> Obviously, no one wanted to have their names in print as saying so, they were obviously scared to death. One vendor told me 'you need to sell Intel to survive you know'. Others named a vendor who did not show because of the pressure, and two or three said 'why do you think there are no motherboards here'? Underneath the happiness of the occasion, there was an undercurrent of uneasiness at best, and it was everywhere.

54.    In March 2005, the Japan Fair Trade Commission ("JFTC") found that

Intel's wholly-owned Japanese subsidiary, Intel Kabushiki Kaisha ("IJKK"), had violated

Section 3 of Japan's Antimonopoly Act, explaining as follows:

> IJKK, since May 2002, has made the five major Japanese OEMs refrain from adopting competitors' CPUs for all or most of the PCs manufactured and sold by them or all of the PCs that belong to specific groups of PCs referred to as 'series', by making commitments to provide the five OEMs with rebates and/or certain funds referred to as 'MDF' (Market Development Fund) in order to maximize their MSS [the proportion of Intel microprocessors incorporated into an OEM's computers], respectively, on condition that

> (a)    the Japanese OEMs make MSS
> at 100% and refrain from adopting
> competitors' CPUs.
>
> (b)    the Japanese OEMs make MSS at
> 90%, and put the ratio of competitors' CPUs
> in the volume of CPUs to be incorporated
> into the PCs manufactured and sold by them
> down to 10%; or
>
> (c)    the Japanese OEMs refrain from
> adopting competitors' CPUs to be
> incorporated into PCs in more than one series
> with comparatively large amount of
> production volume to others.

55.    As a result, according to the JFTC, "the ratio of the sales volume by AMD Japan and Transmeta USA among Total Domestic CPU Sales Volume decreased from approximately 24% in 2002 to approximately 11% in 2003.  By means of such conducts, IJKK has substantially restrained the competition in the market of CPUs sold to the Japanese OEMs, by acting to exclude its competitors' business activities related to the sales of CPUs to the five OEMs."  Intel has accepted the JFTC's recommendations and has chosen not to contest its conclusions.

### Intel's Anticompetitive Practices Directed at Distributors

56.    Intel uses many of the same tactics it practices on OEMs to restrict distributors from carrying AMD processors or selling AMD products into markets it deems strategic.  For example, it entered into an exclusive deal with Synnex, which is one of the largest microprocessor distributors in the United States.  Given Intel's greater than 80 percent market share, there is no pro-competitive justification for this arrangement.

57.    As with OEMs, Intel offers discounts and rebates to distributors on the condition that they not do business with AMD, either worldwide or in strategic sub-markets.

58.    Intel also offers a panoply of special programs for distributors who carry Intel microprocessors exclusively: marketing bonuses, increased rebates, credit programs for new customers (credits that can be used for all products from Intel and any other suppliers), payment for normal freight charges, and special inventory assistance such as credits to offset inventory costs.

59.    Intel also offers retroactive rebates triggered when a distributor reaches a prescribed buying quota. Like the rebates offered to OEMs, the intent is to inflict economic punishment on those who do too much AMD business. But, unlike OEMs, distributors remain ignorant of the goals Intel has set for them or the precise consequences of failing to meet them. Intel does not share this information with distributors; they simply receive a check at the end of the quarter. As a result, every AMD chip that distributors purchase, they buy at their peril.

### Intel's Anticompetitive Practices Directed at Retailers

60.    Approximately one-fifth of desktop and notebook computers are purchased at retail stores. A handful of retailers dominate the United States PC market: Best Buy and Circuit City are the largest, and other significant retailers are Wal-Mart, Staples, Office Depot, and Office Max.

61.    Most of the PCs sold at retail are sold during four or five "buying seasons" that correspond to events on the calendar, and retailers refresh their inventory for each. A chipmaker faces a two-step process to get its platform on retail shelves: first, it must

convince one or more OEMs to build machines using its microprocessor at a suggested price (called "getting on the roadmap"); and second, it must convince the retailer to stock and devote shelf space to these machines.  In exchange for shelf space, the major retailers demand market development funds ("MDF"), which frequently entails a marketing-related opportunity that a chipmaker must buy for tens of thousands of dollars, such as space in a Sunday circular, an in-store display, or an internet training opportunity with the chain's sales staff.

62.    Intel has historically enjoyed an advantage over AMD at retail because, using many of the strategies described above, it has had greater access to the OEMs' "roadmaps" and the ability to exert pressure to keep AMD out of OEMs' product plans. Also, it has significantly greater financial resources with which to buy retail shelf space. To leverage those advantages, however, Intel also has made exclusive deals with many key retailers around the world.

63.    According to AMD, it has generally outperformed Intel on a shelf-space to sales basis.  In the desktop segment during the fourth quarter of 2004, AMD-equipped computers captured between a 33-38 percent share of Circuit City's sales, despite being limited to 5 of the 25 models (20 percent) on the Circuit City shelves.  At Best Buy and CompUSA, with only approximately 15 percent of the shelf space, AMD computers account for roughly 30 percent and 22 percent of the stores' sales, respectively.  These numbers confirm that AMD's products perform well at retail, provided that space is available.

64.    To further limit AMD's ability to compete, Intel instituted a rebate program similar to what it foisted on OEMs, with similar exclusionary effect.  Under this

program, Intel provides full MDF payments to retailers only if they agree to limit to

20 percent not just the shelf space devoted to AMD-based products, but also the share of

revenues they generate from selling AMD platforms.  If AMD's share exceeds

20 percent, the offending retailer's marketing support from Intel is cut by 33 percent

across all products.

### Intel's Anticompetitive Practices Involving Industry Standard-Setting and Other Technical Abuses

65.    Companies within the computer industry often agree to design certain

aspects of their products in accordance with industry standards to ensure broad

compatibility.  Indeed, standards are not only ubiquitous in the computer industry, they

are essential.  But when a company is unfairly excluded from the standards-setting

process or is denied timely access to the standard, competition can be restrained in a way

that reverberates throughout the entire market.  Intel has employed, and continues to

employ, a variety of tactics that have the purpose and effect of excluding and/or

hampering AMD's full and active participation in the development of important industry

standards.  It also has worked to deny AMD timely access to such standards.  Its efforts

have hindered AMD's ability to compete vigorously in the market.

66.    Although there exist industry organizations responsible for the standards

governing computer memory chips, such as the Joint Electron Device Engineering

Council ("JEDEC"), Intel has established secret committees, such as the Advanced

DRAM Technology ("ADT") Consortium, in which it has disproportionate power, to

develop competing standards.  Such arrangements allow Intel to tighten its control over

the industry by converting what component manufacturers intend as a public standard

into a proprietary one, and to competitively disadvantage AMD by giving Intel a head start in completing designs that are in accord with new industry standards.

67.    Even where it has been unable to exclude AMD from participating in the development of industry standards, Intel has attempted to drive the adoption of standards that have no substantial consumer benefit and the sole or dominant purpose of which was to competitively disadvantage AMD based on its highly integrated microprocessor architecture.  For example, Intel proposed that JEDEC modify a proposed industry standard for dual inline memory modules ("DIMMs") in a way that had no technical merit but that, if adopted, would delay AMD's introduction of a technologically superior part.

68.    Intel also has designed and marketed microprocessor-related products with the goal of compromising performance for those who opt for AMD solutions, even if it requires Intel to sacrifice its own product quality and integrity.  For example, Intel has designed its compiler, which translates software programs into machine-readable language, to degrade performance when a program is run on an AMD platform.  When software programs created with Intel's compiler detect an AMD microprocessor (*i.e.*, when the "CPUID," which identifies the microprocessor, is "AuthenticAMD"), they execute a code path that degrades the program's performance or causes it to crash.

69.    A June 2004 discussion that occurred in one of Intel's online forums illustrates the issue.  A user wrote in to the forum to complain that "code compiled with the -xW flag now crashes on AMD Athlon chips.  Looking at the code, it appears that the compiler now deliberately checks whether it's running on an Intel processor and if not disables SSE support, despite the fact that Athlon MP and XP chips do SSE perfectly

well." An Intel employee, "tim18," responded that the problem was "not deliberate, it's

an oversight, due to AMD processors not being supported or tested with those

options. . . . If it were deliberate, there would have been an explicit message displayed

indicating non-support for your processor, rather than a crash with an unhandled CPUID

result." The user disagreed:

> No, the problem is deliberate. The older versions of IFC
> (version 7) produce code that works perfectly well on both
> Intel and AMD chips. The latest version does not. What is
> the difference? The new version, in the _intel_cpu_init
> internal function, checks the CPUID for the string
> "GenuineIntel". If that string is not present, the
> _intel_cpu_init function sets the CPU capability flags to
> zero, indicating that the processor doesn't support SSE2 or
> SSE or MMX or…. Hence if you have compiled code with
> –xK (which requires SSE support), it will crash on the
> Athlon XP chip: the code checks whether the CPU supports
> SSE, incorrectly finds out that it doesn't, and dies. The
> code will work fine if compiled with –axK (ie check if SSE
> is supported, and run generic i386 code if it isn't), but the
> SSE code will _only_ run on Intel chips and not on any
> others, even if the other chips are perfectly capable of
> handling SSE instructions. This isn't an Intel/AMD
> compatibility issue. This is a deliberate attempt by the
> compiler engineers to hobble the performance of IFC-
> produced code on non-Intel processors.

70.     The forum moderator subsequently wrote that, "[a]s Tim correctly

pointed out, this was a bug introduced into the vector math library. It is fixed in the

current 8.0 compilers. There are no plans to fix it for 7.1." In fact, while the 8.0 version

no longer has SSE ("Streaming SIMD Extensions") problems, it does still check the

CPUID to determine whether the microprocessor is manufactured by Intel or AMD.

Thus, the potential for similar abuses continues to exist even with the newer version of

Intel's compiler.

71.    Because Intel's compiler is superior to compilers offered by third parties in terms of floating point or vectorized mathematical calculations, software programmers choose Intel's compiler for legitimate reasons. Unbeknownst to them, however, performance of their programs is degraded when run on an AMD microprocessor – not because of design deficiencies on the part of AMD, but rather due to Intel's anticompetitive behavior.

## ANTITRUST INJURY

72.    Intel's exclusionary and restrictive practices described herein have suppressed competition in the relevant market and thereby have resulted in higher prices for Intel x86 microprocessors, even after accounting for any discounts or rebates attributable to microprocessor purchases. The overcharge imposed by Intel has been passed on to plaintiff and other Class members in the form of higher prices for personal computers, workstations and servers containing Intel x86 microprocessors.

73.    Intel's supra-competitive prices are not the result of superior products or business acumen or competition on the merits. Instead, Intel has been able, at the financial expense of Class members, to artificially inflate prices for its products by engaging in a series of exclusionary acts and restrictive practices with the purpose and effect of restraining and preventing competition and unlawfully acquiring and maintaining its monopoly in the worldwide x86 Microprocessor Market.

## COUNT I

### Violation of State Antitrust Statutes

74.    Each of the above allegations is incorporated and repeated herein.

19684.1\282834v1

75.    Plaintiff seeks damages for himself and the Class as permitted under the following state antitrust laws for the following violations.

76.    Intel has violated Arizona Revised Statutes § 44-1403.

77.    Intel has violated California Business & Professions Code § 16700, *et seq.*

78.    Intel has violated District of Columbia Code § 28-4503.

79.    Intel has violated Florida Statutes § 542.19.

80.    Intel has violated Iowa Code § 553.5.

81.    Intel has violated Kansas Statutes § 50-101, *et seq.*

82.    Intel has violated Maine Revised Statutes, Title 10, § 1102.

83.    Intel has violated Michigan Compiled Laws § 445.773.

84.    Intel has violated Minnesota Statutes § 325D.52.

85.    Intel has violated Mississippi Code § 75-21-1, *et seq.*

86.    Intel has violated Nevada Revised Statutes § 598A.060.

87.    Intel has violated New Jersey Statutes § 56:9-4.

88.    Intel has violated New Mexico Statutes § 57-1-2.

89.    Intel has violated New York General Business Law § 340, *et seq.*

90.    Intel has violated North Carolina General Statutes § 75-2.1

91.    Intel has violated North Dakota Century Code § 51-08.1-03.

92.    Intel has violated South Dakota Codified Laws § 37-1-3.2.

93.    Intel has violated Tennessee Code § 47-25-101, *et seq.*

94.    Intel has violated Vermont Statutes, Title 9, § 2453.

95.    Intel has violated West Virginia Code § 47-18-4.

96.    Intel has violated Wisconsin Statutes § 133.03.

## COUNT II

### Violation of State Consumer Protection Statutes

97.     Each of the above allegations is incorporated and repeated herein.

98.     Plaintiff seeks damages for himself and the Class as permitted under the following state consumer protection statutes for the following violations.

99.     Intel has violated Alaska Statutes § 45.50.471, *et seq.*

100.    Intel has violated Arkansas Code § 4-88-101, *et seq.*

101.    Intel has violated California Business & Professions Code § 17200, *et seq.*

102.    Intel has violated District of Columbia Code § 28-3901, *et seq.*

103.    Intel has violated Florida Statutes § 501.201, *et seq.*

104.    Intel has violated Idaho Code § 48-601, *et seq.*

105.    Intel has violated Maine Revised Statutes, Title 5, § 207, *et seq.*

106.    Intel has violated Montana Code § 30-14-101, *et seq.*

107.    Intel has violated Nebraska Revised Statutes § 59-1601, *et seq.*

108.    Intel has violated Nevada Revised Statutes § 598.0903, *et seq.*

109.    Intel has violated New Hampshire Revised Statutes § 358-A:1, *et seq.*

110.    Intel has violated New Mexico Statutes § 57-12-1, *et seq.*

111.    Intel has violated North Carolina General Statutes § 75-1.1, *et seq.*

112.    Intel has violated Utah Code § 13-11-1, *et seq.*

113.    Intel has violated Vermont Statutes, Title 9, § 2451, *et seq.*

114.    Intel has violated West Virginia Code § 46A-6-101, *et seq.*

### RELIEF REQUESTED

WHEREFORE, Plaintiff requests:

19684.1\282834v1

A.      That this Court declare, adjudge, and decree this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

B.      That this Court declare, adjudge, and decree that Intel has committed the violations of state antitrust and consumer protection laws alleged herein;

C.      That Plaintiff and other Class members recover the maximum damages permitted under the state antitrust and consumer protection laws determined to have been violated by them;

D.      That Plaintiff and other Class members recover their reasonable attorneys' fees and costs of suit;

E.      That Plaintiff and other Class members recover pre-judgment and post-judgment interest on the above sums at the highest rate allowed by law; and

F.      That Plaintiff and other Class members be granted such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury of all issues so triable in this case.

**PRICKETT, JONES & ELLIOTT, P.A.**

By: _David W. Gregory_

     James L. Holzman (DE Bar #663)
     David W. Gregory (DE Bar #4408)
     1310 King Street
     P.O. Box 1328
     Wilmington, DE 19899
     (302) 888-6500
     jlholzman@prickett.com
     dwgregory@prickett.com
     *Attorneys for Plaintiff Gabriella*
     *Herroeder-Perras*

OF COUNSEL:

**ROSS, DIXON & BELL LLP**
Roy M. Bell
Jason S. Hartley
550 West B Street Suite 400
San Diego, CA 92101
(619) 235-4040
rbell@rdblaw.com
jhartley@rdblaw.com

Dated: August 22, 2005

19684.1\282834v1